Thank you, Your Honor. Nicholas Porrett of Levy & Kaczynski on behalf of Plaintiff Appellant. With the Court's permission, I'd like to reserve five minutes for rebuttal argument. Please watch the clock. I will do my best, Your Honor. May it please the Court, this is an appeal from the dismissal of a securities class action on behalf of a class of investors' purchases of Mattel stock from October 2016 through to April 2017. The complaint alleges that the defendants misled the market concerning the effect of a significant change in the marketing strategy by Mattel during that time period. Mattel, at the end of 2016, was facing declining demand for its product and in response decided to ship more products to its various retail customers, retail channels. So could I just stop you right there and ask, forgive me if you're interrupting, but what's the change? Is it just a question of degree? It's a change of degree, Your Honor, yes. So the nature of retail or manufacturing products for retail is you ship to your retail channels and you obviously hope to sell everything that you ship and you get what is alignment. Now, hopefully, because what you don't sell, you have to either discount heavily or else take back. And so obviously you aim for the ideal is to have a 0% rate. That's obviously not achievable. Mattel historically had had value between an 8% and 10% return discount sort of rate. After the holidays? That was over time throughout each year, including the holiday period, yes, Your Honor. So historically they had managed to have what they would have a way they called sales adjustment, which included returns, included discounting, et cetera, of between 8% and 10% roughly historically. What happened in the end of 2016 is that they so dramatically increased the amount of inventory that they shipped out that they inevitably created a situation where that discounting and returns would have to increase far beyond what those historical rate was. Now, there's nothing inherently wrong with that necessarily as a business strategy. The concern was that this was not disclosed to the market. That significantly increased the risk that investors faced when they saw the historical amount of gross shipping and sales. They had assumed or they would naturally assume that the historical rate would roughly apply between 8% and 10%. So given that we're supposed to consider whether the pleadings are sufficiently particular and specific, where in the pleadings should we look for real specific numbers as to why what was Mattel's business model of shipping more and making sales adjustments afterwards was really much worse during the class period? Where should we look for specific numbers or particulars? So the numbers are best reflected in the ultimate adjustment they had to make, which they announced in January 2017, which increased from 185 million in 2015 up to 249 million in 2016. I think Judge Akuda's got the same question I've got, and she's asking you where's the complaint? Where does the complaint make those allegations, the specific allegations that you're now telling us about? I'm tempted to answer your question. So the answer is in a number of places. Point one, in terms of specific numbers, it's best measured by the adjustment, the increase in sales adjustment that they made at the end of 2016, which was an increase from 185 million, about 8.5% of sales in 2015, up to 249 million and about 12% at the end of 2016. But paragraph 29 of the complaint. And that's paragraph 29 of the complaint. That's page 302 of the record, Your Honor. In terms of the change, that is best described, I think, from the accounts from the various former employees of Mattel, who were at all levels of the company. We have former employees. Some of them were – one was the chief information officer, so quite a senior executive. We have it down to senior marketing, and we have a couple of people in between. So – and they all describe a very similar pattern. All right, so forgive me for interrupting again, but your time is ticking, and you know that the district court thought otherwise. So as to the IT person, as I read it for all of your confidential people, the court either said either they weren't there during the operative period of time or they weren't really placed in a position to be opining on this with firsthand knowledge. So, for me, it would be helpful if you could respond to those. Yes, and with respect, Your Honor, I don't think she – I don't think the district court found that they didn't have the firsthand knowledge. She found that the knowledge that they had was not directly tied. Under Zucco, as you know, it's would the person really know what they claim to know? Well, that's firsthand knowledge. And then does what she – what they know really, you know, really directly affect or impact the allegations? Does it really support the allegations? I'm sorry, Your Honor. I'm talking about the employee one who wasn't at the company during class period. So you're talking about employee two and three? Well, I think that with respect to the district court, I think she unduly discounted the statements of first employee one, former employee one, because former employee one was in a fairly senior role. He was there until just before, until about May 2016. About five months before. But isn't that when they get – and Mattel at least says when they get into the seasonal period, that's when these activities would have occurred. Correct. But what he is – what the former employee describes is the systems that are in place and the regular reporting and the attention, the information that not only was available to the CEO and the other senior executives, but that they did actually use. But isn't the theory that during the period in the seasonal period that despite their statements that there was alignment between the – providing the inventory and the retail sales, in fact, they knew there was not a lot – it was much different than it had been in prior years. Isn't that the theory? It was different. It was not aligned, to put it that way. Well, aligned doesn't really mean anything. So I think that you're saying that compared to how it had been in prior years, it was not as favorable or it was – is that what you're saying? Yes. Aligned is somewhat of a term of art in terms of what Mattel uses. I mean, Mattel frequently uses the term aligned. Aligned versus gap was sort of the two different stages. And aligned means that they use that to describe when their shipments and their retail sales were trending towards the historical norm or trending towards zero, i.e., that's what you wanted. You didn't want a big overhang of inventory. Judge Okuda has a question similar to mine. And I think that instead of talking about aligned, I'm talking about heightened risk. And you talk about the heightened risk to which the company was exposed, but I think that the district court found that there was nothing to support this notion of a heightened risk that you claim Mattel was to articulate. So where is the actual evidence that supports the heightened risk and that you disclosed that heightened risk? Well, the heightened risk wasn't disclosed, Your Honor. It should have been disclosed. It should have been disclosed, yes. So the heightened risk is whenever you oversupply inventory, if that is not selling through, you are inherently creating a risk that that inventory will have to be returned or will have to be discounted in the future. It's a very common sense inference. If you have a toy that's being marketed for Christmas in January, you can't sell it for the same way you can in December. Right. But you have to support that. You have to demonstrate that the current risk was greater than the risk from prior years. And where do you support that? Again, I would go back to the, I think, the support in a number of places. One, the fact they did have to make the adjustment, but that's not the only thing we rely on. Also, just the testimony from the marketing and from the executives saying that inventory, they're aware, it was frequently discussed at executive meetings, this issue that of oversupply of inventory was understood and talked about. The company itself talked about how later on admitted that it had a difficulty pushing inventory during the fourth quarter. But it's really the testimony from people talking about this problem built up in the third quarter and it's carried over into the fourth quarter. When I asked about specific numbers, you referred me to paragraph 29, which is a retrospective look. Does that mean that there aren't really any allegations about what was happening during the months leading up to the end of the year? Well, the allegations comes from the evidence or the allegations coming from the former employees who talk about the heavy. Specific numbers. They don't have a specific number. So you're relying on former employee two and former employee three, is that correct? Correct. To discuss about the nature of inventory that was increasing, that's correct. So the district court said former employee two was a relatively junior marketing analyst who was about five reports away from any of the defendants. Does that not make a difference? Should we take that more seriously than the district court did? Well, I would submit so. The former employees build upon each other to create a whole picture. And the former employee two is a senior marketing analyst. So with respect, I think that former employee is slightly more senior than the district court gave credit. Do you disagree that they're three, four? They are removed. Sorry, excuse me, Ron. But they are not removed from seeing the level of inventory that was going to the retail channel, to the retailers. So the district court said this person focused only on Target? Correct, which is one of Mattel's largest customers. So about three customers, including Target, Target, Walmart, and Toys R Us, I think it is, were about 39% of all their sales. And their top 10 retailers are, you know, something over 50% of their sales. So they have very, and I'm aware my time is running out, but anyway. So former employee two, I think, gives the best, most direct evidence of a specific example of how inventory was building up at the retailers. And that was going to create a problem for Mattel, starting in the third quarter and then really coming to a head in the fourth quarter. And that was known in October 20 when the first misrepresentations were made. The other former employees show that the CEO was the one who made, and the CFO was aware of this information, received regular reports, weekly reports about this inventory. So they knew when they made statements saying we're aligning and everything looks okay and we're telling the investors that you should rely on historical rates of sales adjustments, that that situation just wasn't the case. So those are the two pieces that the former employees put together the court should imply. And I'm down under three and a half minutes, so unless you have anything immediately, I'll try and reserve my time for rebuttal. All right, thank you. We'll hear from the other side. May it please the Court, Fred Rowley, Jr. for the Mattel defendants. I'd like to start with a question that Judge Akuta asked and that Judge Kristen picked up on because I think it gets to the heart of Judge Phillips' concerns with the complaint, and that is the nature of the business here. There's no dispute but that Mattel's business is seasonal. It's pled in the complaint at paragraph 25. The 10-K discloses that the nature of the toy business is seasonal in nature, that the holiday period is very significant. It's also disclosed in the 10-K that sales adjustments and concessions are a common practice. The complaint itself acknowledges that. And so I think what Judge Phillips was trying to say in analyzing the complaint is in a situation like this where the business is seasonal, where you're going to have front-loaded shipments with possibly some concessions on the back end, there has to be something that distinguishes the sales period that's in question from your general or usual business cycle, and there's simply nothing in the complaint that would tell you that. And so when you have a, quote, channel-stuffing scheme that's alleged, and that's still what's on the table here, the plaintiff has abandoned a lot of the allegations and statements that are challenging the complaint, but paragraphs 39 and 40 and 70 and 71, which we think are the main allegations that plaintiff is pressing, still resonate in channel-stuffing. And in a case like that, you have to plead specific facts to show that what the defendant tried to do was to take advantage of the inflated sales. And that's going to be in the short run if you had, for example, stock sales when the retail sales figures were highest. And you don't have those kind of facts pled here. That's the fundamental problem with the complaint, but it's reflected in the specific defects that Judge Phillips found. So if you take, for example, the statements about alignment, those are very general statements. They are the kind of corporate optimistic statements that corporations often make. The plaintiff, I would note, has abandoned the backward-looking aspects of those statements. In paragraph- A lot of the alignment statements are actually puffery statements, but Judge Phillips relied on the fact that they were false. Well, so Judge Marbley, I think she said a couple of things about that alignment statement. One, it's corporate puffery. It's too general to be susceptible of objective verification. It also has a forward-looking bent, and that also makes some of these statements non-actionable. And I would also note, this is very important, that the plaintiff, when you're talking about the third quarter of 2016, says at footnote six of the opening brief, so this is on page 11, that they are not challenging statements about third quarter results and gross margin targets. So backward-looking statements, when you're talking about third quarter performance, are off the table. And that only makes sense, right, because Mattel made disclosures about sales, net sales, gross sales, sales adjustments. These disclosures were made in their earnings statements and in their third quarter 10-Q, and those statements aren't being challenged by the plaintiff. So really, when you're talking about the phrase alignment, what the plaintiff is trying to do is challenge the forward-looking aspect of those statements, and those aren't actionable. To add to the confusion, the plaintiff is actually abandoned in their complaint- I'm sorry, in their opening brief. And here I'm thinking of page 34, note 10, has abandoned any challenge to the district court's analysis of forward-looking statements. So it's actually hard to see what's even on the table anymore. I think that's right. It is kind of hard to see, but if you would look at statement one, if you would. Sure. And because it seems to me to be sort of somewhere in the middle, because to the extent it could be viewed as a real-time statement about whether or not too much product was being shipped so that a glut was not occurring, you know, at the retailer location, I think. It says, We were especially encouraged by the momentum of our top line where our positive consumer take- I love this language, if one could translate. It says, We were especially encouraged by the momentum of our top line where our positive consumer take- I think that means sales. Yes. Is aligning nicely with shipping. So, right. I think translated that means that Mr. Sinclair is telling people on the phone that sales were keeping up with shipping. Is that a fair translation, first of all? Is that what he's saying? Your Honor, you're right that consumer takeaway does refer to sales, so consumer sales. And the other thing that is being referred to, the relationship that's being described there, is retail sales-I'm sorry, consumer sales to retail shipping. Sometimes that's called gross sales as well. But that sentence leads directly-go ahead, Judge Kristen, sorry. Forgive me for interrupting, but it just seems to me that that statement is a real-time statement, if you will, about this is what's happening right now, and it's at the critical time. Right. That's their theory, that Mattel had this cyclical sales history. It's all going to happen at Christmas, pretty much. Right. And so this is a-why isn't this a real-time statement that a glut isn't being created? You know, it's moving-the product's moving through the pipeline. So, Judge Kristen, a couple of points about that. First, to the extent that it's a real-time statement, a statement about the current level of retail shipments versus consumer sales, the plaintiff has abandoned that challenge. There were underlying disclosures about gross sales-I'm sorry-and also net sales, and then sales adjustments. These were made in the earnings statements, and the plaintiff has said we're not challenging those allegations, referring to those figures anymore. So the underlying figures here aren't being challenged. That's the problem I have because there's a question about whether there are eight statements left, maybe six statements left. Exactly. What's left? And it seems to me that this is statement number one, I think, as I read their briefs, is still on the table. Yes, Your Honor, but it is confusing because the underlying data, the sales figures, the sales adjustment figures- It's how it compares to prior years. In other words, they don't argue. I think you were going to point out that the next sentence says something about mid-single digits versus low-double digits. Right. But the point is not whether those numbers are correct, but whether it's comparable to what happened in prior years. And if I understand the argument, the argument is it was not comparable, and the senior officials would have known that. Yes, Judge Okuda, so the more general problem is that the word align is simply too vague to be susceptible of objective verification. It is the kind of statement of corporate optimism that investors know not to rely on, and it leads, importantly, it leads directly into a statement about future projections that is actually cautious, right? So the next statement is this increases our confidence as we get set for the holiday season and we look to deliver on our challenging 2016 top-line objectives. So they're saying we're heading into the holiday season. Everybody knows that this is significant. We have challenging objectives, and we have some confidence leading into that holiday season. That's why the first thing we talked about was the first question I asked about, isn't this just a question of degree? Because Mattel has, I think it's uncontested, has this historical pattern. Yes. Right? Right. And I think, Judge Kristen, what Judge Phillips concluded in just looking at the allegations as a whole is that there aren't specific facts that are pled to show that what management was trying to do here was something different than the ordinary business cycle, that they were trying to inflate retail sales to prop up the stock price to benefit in some way. There simply aren't specific allegations of the kind that you would need to see in a channel stuffing case in order to support that inference. I would like to just quickly get to the confidential witnesses because there were a couple of questions about that as well. And Judge Phillips carefully analyzed the allegations that were made about those confidential witnesses, and we submit that her analysis is exactly right. The problem is that if you look at the case law in the circuit, Zucco Partners and NVIDIA, there are fundamental problems with each of these witnesses. Now, they're different, but with each of them there is a real problem. With respect to former employee number one, he had left Mattel five months before the class period. The main contention from former employee one is that the CEO, Sinclair, received reports that drew on sales figures. So that's the contention. But this witness wouldn't have known, would have no basis to know whether Mr. Sinclair actually received those reports. What's more, there's no specific allegations about what the contents of the report were, because, again, this witness was not there. This is a significant defect. If you look at the court's cases, including Intuitive Surgical and Zucco, these kind of reports have to be pled with particularity. And going all the way back to Silicon Graphics, there's good reason for that, because if you could just allege, well, the executive must have known that this problem existed at the time of the class period, they were running the company, and there must have been reports about this, all securities class actions would be able to proceed, and that is exactly what the PSLRA was meant to avoid. How long had FE1 been working there at the time that he left? Your Honor, I believe that he worked there for a couple of years. So had he worked at Mattel during other business cycles such that he could rely on his historical knowledge and trend data? So, Judge Marbley, I want to be precise in my answer. I think that he worked there, I have this right, October 2014 to May 2016, so it's about 18 months. But the only contention that he makes is that Sinclair had asked for this report. So he doesn't make any contention about what was actually in the report. He says he asked for a report that would draw on sales. But he wasn't there at the time of the class period. And it's not even enough to – So he couldn't rely on what had historically happened at Mattel, even during seasonal cycles. Is that what you're telling me? Your Honor, he did have some experience with past seasonal cycles. But the court's precedents make it clear that you can't assume awareness. You actually have to plead facts to show that the executive got the report. And then you have to plead facts showing what was in the report. Some language from Intuitive Surgical that's directly on point here. Missing or allegations linking specific reports and their contents to the executives. Not to mention the link between the witnesses and executives. That's just the situation you have here with former employee number one. He does refer to disappointing sales and increasingly bloated inventories at retailers. Yes, Your Honor. But, again, that is the kind of general contention lacking in specificity that the court has repeatedly rejected in cases like Zucco Partners and in cases like NVIDIA. Indeed, as we submit in our brief, the court has rejected an inference of Scienter in cases involving many more confidential witnesses with more detailed allegations than what you have before you here. Judge Phillips considered these witnesses even in the aggregate. And when you add up the witnesses' contentions, because there are such fundamental problems with the information that they provide, you can't draw the strong inference of Scienter that the PSLRA requires. Indeed, the most compelling and cogent inference from the allegations in the complaint and from the other judicially noticeable documents is that this was a situation where you have a cyclical business. They made some optimistic projections about the 2016 holiday season. They didn't make their numbers. They had a disappointing holiday season. They disclosed it in January. They projected that they would be able to deal with the retail overhang, and then that didn't work out. Also, they had a disappointing situation with the retail overhang. That is not securities fraud. You need to plead with much greater specificity in order to support a strong inference of Scienter. And in this kind of channel-stuffing case, you have to plead more specific facts to show that the scheme was improper. If you look at the paragraphs that address the allegations that remain on the table, you look at paragraphs 45 and 46 of the complaint, you look at paragraph 72 of the complaint, what you have there is a general, conclusory allegation about why what happened was fraudulent. It's just these statements are false and misleading because it was channel-stuffing. That's conclusory in precisely the way that Metzler rejects. It's almost the case, though, that it would be impossible to prove because based on your theory, the only people who would have that type of specificity are current employees, at least that's sort of the way you set it up. And so you'd have to have current employees who feed people like Mr. Castro the information so that Mr. Castro could plead with the requisite specificity. And I don't think that's what the PSLRA was meant to do. So, Judge Marbley, there are situations in which on the basis of former employee or confidential witness contentions, there's enough to support an inference of Scienter. It is not the case that you have to have current employees. It's just that what you have before you here is not enough. There are cases where you have allegations by former employees that have the specificity that describe the kind of reports that are adverted to in the complaint here that are sufficient to support security. This just isn't one of those cases, and I think that's why Judge Phillips rejected the complaint on multiple grounds, not just one. Thank you. We have some time for rebuttal. There are three points I'd like to address, if I may. So I'll put about a minute each. First of all, Judge Christin, you did accurately capture the essence of what a complaint is, which is the allegations are that the defendants misrepresented or failed to disclose the true nature of the state of the business, Mattel's business, in October 2016. Quickly, and I know you're just watching your clock there, and you don't have to go over them. If you could just identify which do you think of these statements that we've got, and we've all looked at all of them, which are the strongest statements that you think meet the bar,  Absolutely, Your Honor. I mean, I would say the Paragraph 40. Okay, Paragraph 40. And which other? What other? Paragraph 40 and 41, I think, are two strong statements that we still rely on. Okay. And as well as in Paragraph 54. Okay, thank you. I don't want to take all your time, but that's helpful to me. Those are the ones in October. There are other ones in January, I think, when they talk about how inventory just exists in pockets and is not a significant issue. Except that in January, that's where he makes the statement. I looked hard at January, because it seems to me at that point they're not projecting it's a fact at that point that they've had this really off year. Correct. But that's where he, just in the same sentence, I think, says, well, it's not horrendous at this point or something. Correct, yes. So it's not exactly inspiring confidence at that point, it seems to me, in the statement. No, but the problem they have is that they created a much bigger problem. They never really disclosed, they didn't disclose in October, the scope of the problem they had created over the preceding quarters in creating this big overhang, if you like, of inventory that existed even in October 2016. Then when they took some sales adjustments and saw some, they still failed to disclose the full nature of the concern. And then they ultimately came in with a new CEO and said, we had a horrible retail, we had spent almost the entire quarter working through our retail, whereas previously they said, we've got some inventory, but it's in pockets, and we think it's going to be very modest, and we'll be able to get through it. So that was unfair. That was not a realist, that was not an accurate presentation of its business. So, and counsel for defendants said you had to show something, which would allege allegations that the practice here, you know, we talked about the change of degree, that this was really very different from historical practices. If I could refer your honor back to, or the court, back to paragraph 29, where there's a chart which I think very graphically shows how much this was out of the historical practice, where we have the, I mean, it's reflected using backward-looking numbers, but it reflects the practice, which shows a fairly, you know, regular line at a similar level, at equivalent level, and then a dramatic increase in the fourth quarter before coming back, kind of back to normal. So that shows the sort of extent of the problem that Mattel and the defendants created here, and failed to disclose that dramatic risk of that happening to investors. And finally, on the question of the nature of the reports and so on, and the cases that defendants cited to, there are more allegations here than they must have known. There were CEOs, you know, there were executives, and the information was available, so they, quote, must have known. We have allegations where for two years leading up to the class period, ending in May 2016, they were receiving reports of sales and inventory and shipments based on weekly and monthly figures created by former employee one. We've got allegations that during the class period, they received this inventories and shipments were discussed at executive meetings, which was accounted by former employee three. We have the fact that they spoke about shipment and retail sales on every conference call, and they are presumably doing that with a basis of knowledge. The fact that, and we talked about how alignment was too vague, and it was just a general optimistic sale. Defendant Dixon himself said it was the best barometer, or the true barometer of the company's success, was looking at the rate of shipment and of inventory. So alignment is not just a mere statement of corporate optimism, but in fact was, at least in the context of Mattel's business, quite a well-followed and understood metric. Unless Your Honors have any further, I'll finish there. Thank you. Thank you very much, Your Honor. Thank both sides for their arguments. The case of Gilberto Castro v. Mattel is submitted.
judges: Ikuta, Christen, Marbley